# EXHIBIT A

# AMENDED

# COMPLAINT

# Index No. 707416/2019

## SUPREME COURT OF THE STATE OF NEW YORK
## COUNTY OF QUEENS

NICHOLAS WEIR,

Plaintiff,

v.

MONTEFIORE MEDICAL CENTER, ALBERT EINSTEIN COLLEGE OF
MEDICINE, and YESHIVA UNIVERSITY.

Defendants.

## BACKGROUND

1. The plaintiff is pro se (non-attorney) and he periodically switches between writing in the third-person and first-person herein.

2. This Complaint essentially arose from the US Court for Southern District of New York (SDNY) declining to hear the plaintiff's state claims, NYSHRL and NYCHRL claims, in a Title VII case (16-CV-9846). While the factual allegations for all four claims (discrimination, retaliation, hostile work environment, and equal pay) likely met the standard under Title VII, the plaintiff's lack of legal experience contributed to less explicit and straightforward statements and points of argument in federal court. The federal court made an error regarding the timeline that gave rise to the retaliatory claims and the three other claims subsequently. This harmful error is a question that is currently before the US Supreme Court (docket number: 18-9007).

3. The plaintiff has been subjected to retaliatory acts from The City University of New York (CUNY) and government agencies from around October 2013. These retaliatory acts began after the plaintiff reported defamatory and discriminatory acts committed against him while he was a student at CUNY.

4. On December 18, 2015, the plaintiff filed a Notice of Intention to file a claim to the Court of Claims, The Attorney General of New York office, and CUNY. The Notice of Intention to file a Claim can act as a Claim in New York Court of Claim in certain situation so it can be viewed as the actual Claim. The plaintiff observed government agents maliciously targeting and stalking him since October 2013.

5.      The plaintiff applied to research assistant/research technician jobs at Albert

Einstein College of Medicine ("AECOM") in September 2015. These job postings had pay rate

of $26/hr with 1199 union contract.

6.      The plaintiff directly reached out to Dr. Gavathiotis via email for a research

technician job opportunity and he was interviewed in October 2015. After his interview, the

plaintiff noticed that the pay rate were no longer being displayed on the AECOM website.

7.      The plaintiff  is a male with a dark complexion from Jamaica. He was hired on

December 7, 2015 to work as a research technician in the lab of Dr. Evripidis Gavathiotis at the

AECOM, and he officially began working there on December 28, 2015. He was being monitored

and stalked daily by state agents so consequently the state agencies knew that he got hired.

8.      The plaintiff was the only research technician in the lab, and he was the only lab

employee of Caribbean descent. The other employees were Asians (two), Caucasians (three), and

light skinned Hispanics (two). The plaintiff assisted Dr. Gavathiotis and others in the lab doing

experiments among other things.

9.      The plaintiff's pay rate was abruptly reduced days after he began working in the

lab. He  received a phone call on his way home that his pay rate has been reduced. He was told if

he was interested in the new pay rate, he should visit the human resource office to sign the

updated documents. He signed the updated contract on January 6, 2016.

10.     The plaintiff began to notice that he was being stalked or monitored whenever he

would leave the Gavathiotis lab in early January. He figured that all he needed to do to pass his

probationary period was replicate experimental results that Dr. Gavathiotis had noted as well as

be a team-player in the lab. Henceforth, he just tried to ignore the stalking and monitoring

outside the lab. He did not want to alarm Dr. Gavathiotis about his personal issues and cause any unnecessary problem. It was a 90 days probationary period to prove himself. But it took him less than a month to prove himself. Dr. Gavathiotis saw how motivated the plaintiff was for biomedical research and near the end of the first pay period asked the plaintiff to work up to 10hrs overtime each week. Additionally, Dr. Gavathiotis confided in the plaintiff and openly expressed the contrast between his motivational level and that of most of the other lab members. The plaintiff was surely excited and motivated to get enough experimental results for publications. The plaintiff's priority was the lab so he would be there late at nights and even came in on the weekends occasionally.

11.     He successfully replicated the experimental results for Dr. Gavathiotis. Dr. Gavathiotis began giving him new experiments more or less the first week of official work. He had actually began training or volunteering in the week prior to his official start date of December 28th. In the early weeks of his employment, the plaintiff regularly received positive reviews from Dr. Gavathiotis. By late January, Dr. Gavathiotis told the plaintiff that he wanted him to work in his lab for a couple of years.

12.     On January 20, 2016, the plaintiff reached out to the Biochemistry department administrator, Ms. Leslie Jefferson, regarding some mysterious words on his first paystub. He had emailed Ms. Leslie his hours and noted explicitly that he had deducted his lunch break from those hours; but yet, Ms. Jefferson only inputted 62 hours instead of 70 hours. Additionally, one of the mysterious word on my first paystub were at a different and lower pay rate. Ms. Leslie didn't reply to his question regarding the mysterious words. He eventually went to her office and she noted that she will add the missing 8 hours to a future paystub. He didn't get an explanation but she eventually added the missing hours.

13. In around mid-January, Dennis return to the lab occasionally to conduct experiments. The plaintiff had taken his desk since he began working. Dennis was a lab member who was the past research technician but now a PhD student at AECOM. Initially, he came in the late evening close to when the plaintiff was about to head home. After awhile, he began showing up sporadically in the day time so eventually the plaintiff moved over to Ms. Onyinyechukwu Uchime's (MD/PhD student) desk. Ms. Uchime was a lab member who was preparing to defend her PhD thesis in around May 2016.

14. In around late January, Ms. Uchime also began showing up in the lab more frequently. Previously, she would seldomly visit the lab. She came in to grow proteins from what the plaintiff heard and saw. She was spitefully nasty to the plaintiff for borrowing her equipment but she would not get annoyed when other lab members borrowed her lab equipment. One late evening, she questioned the plaintiff's successful replication of experimental results that had been praised by Dr. Gavathiotis. She did this while not having any knowledge of his results or that Dr. Gavathiotis praised his results. Her tone of voice was elevated and lab members in the adjacent lab could hear her scolding the plaintiff. Dennis actually came over to calm her down and he was puzzled that she was discrediting the plaintiff's results. Dennis and Xiomaris (lab member who sat chair to chair behind of the plaintiff while he was at Dennis' desk) were the two lab members who were familiar with the kind of experiments he was doing. The plaintiff was forced to move back to Dennis's desk because of the treatment he experienced from Ms. Uchime; but Dennis would be in the lab at times and needed his desk. Consequently and technically, the plaintiff did not have a stable workstation that all the other nine lab members had.

15.    Separately, the plaintiff was explicitly asked by lab members including Dr.

Gavathiotis which country he was was from while he was working in the lab. There was no

specific reason for the question stated for the inquiry.

16.    Xiomaris and Dennis were the two lab member whom the plaintiff shadowed for

about a day before he began to work independently. For the first few weeks, he would ask lab

members, mostly Xiomaris, sporadically where different equipment or apparatuses (most were in

cabinets) were located. The plaintiff was assigned experiments of treating cancer cells with

different concentration of different drugs. This experiment was essentially new in the lab because

the lab had just got a new machine days after the plaintiff began working. The plaintiff

conducted experiments on his own (assigned sometimes daily by Dr. Gavathiotis) and worked

independently. There were three prominent occasions where the plaintiff really needed help: (1)

when he was trying to better understand how use a software to present his experimental data, (2)

when he wanted to understand and partake in the Western Blotting experiments that Xiomaris

was assigned to, and (3) when one of his cancer cell lines suddenly started to die off. These are

the three major instances when the plaintiff reached out for Xiomaris' help. She seemed happy to

help on those occasions so the plaintiff was very surprised when Dr. Gavathiotis told him about

her complaining around early February. Technically, the plaintiff was still in his probationary

training period despite being independent and carrying out experiments independently.

17.    After Dr. Gavathiotis informed the plaintiff about Xiomaris fabricated complaint,

he went to work with Dr. Nikolaos Biris on growing, purifying, and measuring protein. Dr. Biris

was very impressed that the plaintiff obtained good results on his first attempt done mostly on his

own (he shadowed Dr. Biris one time). At the same time, another lab member, Pavlos (visiting

PhD), was unable to get positive results. Pavlos was another lab member who so happened to show up around the same time in late January.

18.    Dr. Gavathiotis and a couple of the lab members whom the plaintiff interacted with suddenly began to treat him differently. Also, suddenly two black lab technicians from distant labs (at least one from another building) began to show up to Dr. Gavathiotis' lab to inquire about something. On one occasion, Dr. Gavathiotis did not inform or invite the plaintiff about a research talk by a visiting researcher and that he was hosting; however, he invited the other lab members. Research talk is informative to lab members' career development, to gain insights into ongoing research projects, and to possibly obtain ideas for addressing challenges and improving one's own research project.

19.    In late February, Dr. Gavathiotis noted that he will keep the plaintiff in the lab until March 31st. The plaintiff sporadically emailed Dr. Gavathiotis his resume as he did several other labs. He reached out to him, interviewed, and hired him. Dr. Gavathiotis really believed in him and over the first month he developed some degree of trust in him. It was the big guys upstairs (within and outside of AECOM) and money which got the best of Dr. Gavathiotis. It was unfortunate but it was these influences that brought the ugly out of Dr. Gavathiotis which ultimately resulted in the changes and discrimination the plaintiff experienced.

20.    Around midday on March 2nd, the plaintiff spoke to Ms. Anne Gartner, Employee Relations Specialist, about his lab situation and that it was due to his ongoing court case against CUNY and the State of New York because of the similar occurrences that were taking place. The plaintiff was hesitant to disclose details of his court case. Ms. Gartner told the plaintiff that he could not be fired without a legitimate reason and that she will investigate the matter.

21.     In the evening of March 2nd, Dr. Gavathiotis call the plaintiff in the office and made a number of excuses to terminate the plaintiff's job. He noted that he was looking for someone who have experience working with mice despite having hired the plaintiff knowing that he didn't have such experience (the plaintiff is a fast learner so he was opened to learning). He then noted that two of the other lab members did not trust the plaintiff. I then asked him if he trust me and he could not answer because he knew that complaint was fabricated. He then told the plaintiff that he "don't fit in" out of frustration. He was visibly angry. He also stated that the plaintiff's new final last work date was March 4th.

22.     On the morning of March 3rd, the plaintiff went to Ms. Anne Gartner again and provided more details of his court case. She asked him to stop telling her about his court case instead of being concerned that he was being maliciously targeted and thus possibly being unfairly terminated. The plaintiff assumed she would be impartial given the role she was assigned in the human resource department. But in actuality she knew that he was maliciously being terminated.

23.     Within a couple minutes of returning back to the lab the morning of March 3rd, Dr. Gavathiotis informed the plaintiff that he got to go now. The plaintiff was puzzled given that Dr. Gavathiotis had changed the final date from March 31st to March 4th the day before and now changing it again. Dr. Gavathiotis noted that the plaintiff would still get paid for March 4th but he got to escort him out the building. The plaintiff was in the middle of working on a document so he asked for a few minutes to finish his work. Dr. Gavathiotis insisted that the plaintiff got to leave now and threatened to call security. Dr. Gavathiotis walked off and about a minute later he had security with him. The plaintiff frantically packed his things and began walking with Dr. Gavathiotis and the security personnel. Before existing the lab, the plaintiff told Dr. Nikolaos

Biris and a few other lab members who were present that he will be back. This was because Dr. Gavathiotis had told the plaintiff that he could volunteer in the lab to gain additional research experience in the meanwhile before finding a new place (i.e. lab). Dr. Gavathiotis seemed surprised at the plaintiffs calm demeanor as they had a brief conversation on their way to the door. The plaintiff asked the security personnel to allow him to go see Ms. Anne Gartner and the security personnel escorted him to the security post on the first floor of the building that had the human resource department. Another security personnel rang Ms. Anne Gartner's office number. Ms. Anne Gartner noted that she have not investigated the matter as yet and she will be doing so soon. On the contrary, she knew about everything that was going on and partook in it.

24.     On March 4th, the plaintiff reached out to Ms. Anne Gartner for a final update on his unfair termination. Mr. Robert Cancellieri, the Director of Employee Relations, informed the plaintiff via email that he was terminated because he "did not pass [his] probation [sic]." The plaintiff's employment was contingent upon successful completion of his 90 days probationary period. However, he was abruptly terminated prior the end of this period.

25.     On March 9th, the plaintiff was informed by Mr. Robert Cancellieri that he cannot visit the lab after Dr. Gavathiotis had told him that he could volunteer in the lab.

26.     The federal case commence December 20, 2016 in the Southern District of New York. The case was dismissed on February 22, 2018 and then appealed in the Second Circuit on March 23, 2018. While the appeal was pending I filed a FRCP 60(b)(1),(3), and (4) motion along with other motions on August 28, 2018. The district court dismissed one of the motions, motion to sanction, noting that it does not have jurisdiction to rule on it and deferred making ruling on the other motions. The United States Court of Appeal for the Second Circuit, represented by Judge Amalya L. Kearse, Dennis Jacobs, and Robert D. Sack, dismissed the case by simply

noting that it "lacks an arguable basis either in law or in fact" on January 24, 2019. The Mandate

was issued on February 15, 2019 to the district court. The district court granted the petitioner's

motion for electronic case filing (ECF) on February 15, 2019. The petitioner mailed the district

court a letter because the ECF did not work for several days despise repeated effort to get it fix

with the ECF office at the court. The court endorsed the petitioner's letter on February 28, 2019

noting that the court had granted ECF on February 15, 2019 and will resolve the other pending

motions in due course. The respondents wrote a letter to the district court erroneously noting that

the petitioner's Rule 60(b) motion was untimely quoting a local rule which had exceptions. On

March 26, 2019, the district court surprisingly agreed that it was moot and untimely despite the

motion being filed about six months in the one year timeline for the invoked FRCP Rule 60(b)

motion.

27.     The District Court had declined to hear my NYSHRL and NYCHRL claims and

the court suggested raising those claims in State Court. In Artis v. District of Columbia (2018),

the US Supreme Court held that "[t]he period of limitations for any [state] claim [joined with a

claim within federal-court competence] shall be tolled while the claim is pending [in federal

court] and for a period of 30 days after it is dismissed unless State law provides for a longer

tolling period." In light the US Supreme Court decision in Artis v. District of Columbia (2018),

the plaintiff is pursuing his state claims. I filed initially filed this complaint in the Supreme Court

of the State of New York, Queens County on April 24, 2019 which is within 30 days of the final

ruling in federal court.

## I.   <u>NYCHRL Retaliation Claims</u>

28.     The first retaliation took place when my employment contract was abruptly

changed days after I began working officially. I was given an ultimatum to take it or leave it.

This was about two weeks after mailing a Notice of Intention to file a claim to the Court of Claims, The Attorney General of New York office, and CUNY. The Notice of Intention to file a Claim can act as a Claim in New York Court of Claim in certain situation so it can be viewed as the actual Claim. I observed government agents who have been maliciously targeting and stalking within the institution during this time period. Other employees of a different race were not coerce to sign a new contract.

29.     The second retaliation took place when I complained about missing hours from my first paystub. On January 20, 2016, I reached out to the Biochemistry department administrator, Ms. Leslie Jefferson, regarding some mysterious words on my first paystub. I had emailed Ms. Leslie my hours and noted explicitly that I had deducted my lunch break from those hours but yet she only inputted 62hrs instead of 70hrs. Additionally, one of the mysterious word on my first paystub was at a different pay rate. Ms. Leslie replied to other questions but she didn't reply to my question regarding the mysterious words and the reason for the missing hours. I didn't get an explanation. The missing hours and the lower pay rate were intentionally done. But Ms. Leslie eventually added my missing hours to a future paystub given that I confronted her about it in her office. Other employees of a different race did not have work hours missing or lower pay rate on their paystub.

30.     The third retaliation took place when I inform Dr. Nikolaos Biris about Uchime's aggressive tendencies towards me and he reported it to Dr. Gavathiotis. Dr. Gavathiotis started to be distant and moody. Gavathiotis' lab was directly bribed and Dr. Gavathiotis knew about the pending court case against the State of New York and CUNY. Other employees of a different race did not experience retaliation for complaining about hostility from a coworker.

Case 1:23-cv-04468-KPF Document 1-1 Filed 05/27/23 Page 13 of 22

31.    The fourth retaliation took place when I informed Ms. Gartner that I was being

terminated because of my lawsuit against the New York State and CUNY. Around midday on

March 2, 2016, I spoke to Ms. Anne Gartner, Employee Relations Specialist, about my lab

situation and that it was due to my ongoing court case against CUNY and the State of New York

because of the similar occurrences that were taking place. I was hesitant to disclose details of my

court case. In the evening of March 2nd, Dr. Gavathiotis call me in the office and made up a

number of excuses to terminate my job and he also stated that my new final date was March 4th

instead of March 31st. Other employees of a different race did not experience retaliation for

complaining about a hostile work environment and unlawful termination.

32.    The fifth retaliation took place when I provided additional details to Ms. Gartner

regarding my lawsuit. On the morning of March 3rd, I went to Ms. Anne Gartner again and

provided more detail of my court case. Surprisingly, she asked me to stop telling her about my

court case instead of being shocked that I am being maliciously targeted and thus possibly being

unfairly terminated. I assumed she would be impartial given the role she was assigned in the

human resource department. But in actuality she knew that I was maliciously being terminated.

Within a couple minutes of returning back to the lab the morning of March 3rd, Dr. Gavathiotis

informed me that I got to go now. I was puzzled given that he changed the date from March 31st

to March 4th the day before and now changing it again. He noted that I would still get paid for

March 4th but he got to escort me out the building. I was in the middle of working on a work

document and I asked him to give me a few minutes. He insisted that I got to leave now and

threatened to call security. He walked off and about a minute later he had security with him. I

frantically packed my things and began walking with Dr. Gavathiotis and the security personnel.

23. I asked the security personnel to allow me to go see Ms. Anne Gartner and the security

personnel escorted me to the security post on the first floor of the building that had the human resource department. Another security personnel rang Ms. Anne Gartner's office number. Ms. Anne Gartner noted that she have not investigated the matter as yet and she will be doing so soon. On the contrary, she knew about everything that was going on and partook in it. On March 4th, Mr. Robert Cancellieri, the Director of Employee Relations, informed me that I was terminated because I did not pass my probationary period. On March 9th, I was informed by Mr. Robert Cancellieri that I cannot visit the lab after Dr. Gavathiotis had told me that I could volunteer in the lab. Other employees of a different race did not experience retaliation for complaining about a hostile work environment which is directly linked to unjust reason for his/her termination.

33.     The five retaliatory claims above are temporally plausible because they initiated about two weeks after mailing a Notice of Intention to file a claim to the Court of Claims, The Attorney General of New York office, and CUNY. Dr. Gavathiotis' lab was bribed and Dr. Gavathiotis knew about my lawsuit in the Court of Claim.

## II. NYCHRL Equal Pay Claim

34.     I applied to research assistant/research technician jobs at Albert Einstein College of Medicine in September 2015. The job postings had pay rate of $26/hr with 1199 union contract. I reached out to Dr. Gavathiotis and he interviewed me in October 2015. After my interview, I notice that the pay rates were no longer being displayed on the Einstein website. I was asked to provide a salary range/pay rate that interest me. But at the end of my interview in human resource, I was informed that the pay rate is non-negotiable.

35.     My pay rate was reduced days after I began working in the lab. I was given an ultimatum to take it or leave it. I signed the updated contract on January 6, 2016. There was a

Case 1:23-cv-04468-KPF   Document 1-1   Filed 05/27/23   Page 15 of 22

Caucasian employee in another lab with similar job title and duty who had a higher pay rate than mine. We were hired around the same time.

### III. <u>NYCHRL Discrimination Claims</u>

36.     The first discrimination based on my race, color, and national origin took placed when my contract was coercingly change days after I officially began working. Though this change has a retaliation component, my race, color, national origin were a motivating factor. Other employees in the Dr. Gavathiotis's lab and even other labs of a different race, color, and national origin were not coerce to sign a new contract.

37.     The second discrimination took place when the institution facilitated outsiders (government agents) and employees to maliciously target and stalk me while I was present at the institution. Though this facilitation has a retaliation component, my race, color, national origin were a motivating factor. Other employees of a different race, color, and national origin were not maliciously targeted and stalked by outsiders and other employees while they were present at the institution.

38.     The third discrimination took place when my work hours were purposefully left out of my first paystub. My race, color, national origin were a motivating factor in reducing and maintaining my biweekly total to a certain amount compared to other employees of a different race, color, national origin.

39.     The fourth discrimination took place when Ms. Uchime repeatedly got nasty to me coupled with me losing a steady workstation, and Dr. Gavathiotis not having a meeting with both of us and making arrangement for me to have a steady workstation. Other employees of a

Case 1:23-cv-04468-KPF   Document 1-1   Filed 05/27/23   Page 16 of 22

different race, color, and national origin had a steady workstation and did not face any brazen

hostility from other employee.

40.     The fifth discrimination tool place when my job was treated in around early

February because of a bad experiment. During the short period that I worked in the lab, I ran

over 25 experiments with different drugs and cancer cells. On one occasion, Dr. Gavathiotis got

very angry at me and even threatened to fire me because one experiment was done incorrectly

due to miscommunication. After observing Dennis and Xiomaris on one or two occasions, I was

off to be independent from the first week. I took instructions directly from Dr. Gavathiotis. In

research labs, miscommunications or mistakes are made at times even with having many years of

experience. This is a fact I learned from individuals who work in research labs. As I noted herein,

I was able to obtain good results on my first attempt mostly on my own while Pavlos were not

able to obtain positive results; this demonstrates that experience do not automatically equate with

expertise. And of course, Pavlos didn't experience any aggression from Dr. Gavathiotis. Dr.

Gavathiotis made attempts to mend his unprofessional behavior the next day. I held myself at a

high standard to not make any mistake or miscommunication so I was partly upset at myself.

Nonetheless, he definitely went way overboard in responding to the mistake. I have never

observed Dr. Gavathiotis getting angry at other lab members outside of my protected group.

41.     The sixth discrimination took place when I conveyed the hostility at work I was

experiencing to Ms. Gartner midday on March 2nd, 2016. Ms. Gartner 'promised' to look into

the matter but in actuality instructed Dr. Gavathiotis to get me out the lab by the end of the week.

In the evening of March 2nd, Dr. Gavathiotis call me in the office and made up a number of

excuses to terminate my job and he also stated that my new final date was March 4th. Though

this poor action to an employee facing hostility has a retaliation component, my race, color,

national origin were a motivating factor. Other employees of a different race, color, and national origin get mitigating actions taken to address any ongoing hostility.

42.     The seventh discrimination took place when Dr. Gavathiotis shrewdly and passive-aggressively (visibly restrained anger) told me that I "didn't fit in" after running out of fabricated excuses. This wasn't because I couldn't do the many experiments that he had assigned to me, didn't get along with the other seven lab members excluding Uchime, or I wasn't a team-player in assisting other lab member when asked. I observed solely individuals outside of my protected group being interviewed for my job position days before my termination. Though this excuse-finding conversation has a retaliation component, my race, color, national origin were the core motivating factor for Dr. Gavathiotis final statement. Other employees of a different race, color, and national origin do not get told that they don't fit it or fabricated comments about their character

43.     The eighth discrimination took place when I provided additional details to Ms. Gartner regarding my lawsuit on the morning of March 3rd, 2016. Surprisingly, she asked me to stop telling her about my court case instead of being shocked that I am being maliciously targeted and thus possibly being unfairly terminated. I assumed she would be impartial given the role she was assigned in the human resource department. But in actuality she knew that I was maliciously being terminated. Within a couple minutes of returning back to the lab the morning of March 3rd, Dr. Gavathiotis informed me that I got to go now. I was puzzled given that he changed the date from March 31st to March 4th the day before and now changing it again. He noted that I would still get paid for March 4th but he got to escort me out the building. I was in the middle of working on a document and I asked him to give me a few minutes. He insisted that I got to leave now and threatened to call security. He walked off and about a minute later he had

security with him. I frantically packed my things and began walking with Dr. Gavathiotis and the security personnel. Though this episode has a retaliation component, my race, color, national origin were a motivating factor. My race, color, and national origin didn't matter much to Ms. Gartner so she wasn't inclined to even listen. The hostility I faced didn't matter much so she instructed that I get kicked out immediately. Other employees of a different race, color, and national origin do not get told that they don't fit it, fabricated comments about their character, or kicked out for reporting hostility at work.

44.     Discrimination is discrimination whether it was done by choice (free-will or out of desperation) or force from others. The law was on Dr. Gavathiotis's side. The code of conduct associated with his career was on his side. But he chose willfully (bribery or quid pro quo) and out of desperation (pressure from colleagues and superiors) to do otherwise. Dr. Gavathiotis chose to retaliate, discriminate, and facilitate a hostile work environment for the plaintiff and ultimately terminated his job unreasonably and unlawfully. Dr. Gavathiotis, Ms. Gartner and the institution overall treated the plaintiff less well in part due his national origin, the color of his skin, and his race in contrast to other employees of a different race, color, and national origin.

## IV. **NYCHRL Hostile Work Environment Claims**

45.     The first hostile work environment was experienced when the institution facilitated outsiders (government agents) and employees to maliciously target and stalk me while I was present at the institution. Though these hostile experiences had both a retaliation and a discrimination component, I subjectively felt harassed and uncomfortable many times when I exited Dr. Gavathiotis' lab. Other employees of a different race were not maliciously targeted and stalked by outsiders and other employees while they were present at the institution.

46.     The second hostile work environment was experienced when Ms. Uchime repeatedly got nasty to me coupled with me losing a steady workstation, and Dr. Gavathiotis not having a meeting with both of us and making arrangement for me to have a steady workstation. Though these hostile experiences had both a retaliation and a discrimination component, I subjectively felt harassed and uncomfortable on several occasions as I carry out experiments. Other employees of a different race had a steady workstation and did not face any brazen hostility from other employee.

47.     The third hostile work environment was experienced when I inform Dr. Nikolaos Biris about Uchime's aggressive tendencies towards me and he reported it to Dr. Gavathiotis. Dr. Gavathiotis started to be distant and moody rather than addressing the situation. Other employees of a different race did not experience unwelcoming demeanor or non-action in addressing a serious and debilitating situation.

48.     The fourth hostile work environment was experienced when I conveyed to Ms. Gartner the hostility I faced at work. She made no attempts to address my situation and instructed Dr. Gavathiotis to get me out by the end of the week. Though these hostile experiences had both a retaliation and a discrimination component, I subjectively felt ignored, neglected, and retaliated against for reporting a hostile work environment. Other employees of a different race do not get ignored, neglected, and retaliated against for reporting a hostile work environment.

49.     The fifth hostile work environment was experienced when I conveyed to Ms. Gartner additional information associated with hostility I faced at work. She asked me to stop talking about my situation and leave her office. She quickly instructed Dr. Gavathiotis to get me out of the lab immediately. Though these hostile experiences had both a retaliation and a discrimination component, I subjectively felt ignored, neglected, and retaliated against for

reporting a hostile work environment. Other employees of a different race do not get ignored,

neglected, and retaliated against for reporting a hostile work environment.

### V.  Aiding-and-Abetting under NYCHRL

50.    The defendants' employees aided-and-abetted retaliation, unequal pay,

discrimination, and hostile work environment against the plaintiff. The factual allegations for

these are noted herein under their respective headings. The defendants are vicariously liable for

the unlawful actions of its employees.

### VI.  NYSHRL Retaliation Claims

51.    Similar factual allegations as noted for NYCHRL Retaliation Claims.

### VII. NYSHRL Equal Pay Claim

52.    Similar factual allegations as noted for NYCHRL Equal Pay Claim.

### VIII.  NYSHRL Discrimination Claims

53.    Similar factual allegations as noted for NYCHRL Discrimination Claims.

### IX.  NYSHRL Hostile Work Environment Claim

54.    Similar factual allegations as noted for NYCHRL Hostile Work Environment

Claims.

### X.  Aiding-and-Abetting under NYSHRL

55.    The defendants' employees aided-and-abetted retaliation, unequal pay,

discrimination, and hostile work environment against the plaintiff. The factual allegations for

Case 1:23-cv-04468-KPF  Document 1-1  Filed 05/27/23  Page 21 of 22

these are noted herein under their respective headings. The defendants are vicariously liable for the unlawful actions of its employees.

56. The plaintiff is demanding a jury trial. The plaintiff is seeks damages including punitive damages, aggravated damages, and nominal damages. The plaintiff also seeks back-pay and back-benefits.

Dated: June 28, 2019

N. Weir

Nicholas Weir

Plaintiff

172 Lawrence St

Uniondale, NY 11553

---

## VERIFICATION

The Plaintiff, Nicholas Weir, is a resident of the State of New York. Mr. Weir mailing address is 172 Lawrence St, Uniondale, New York 11553.

Nicholas Weir, being duly sworn, deposes and says:

I am the plaintiff in the above-entitled action. I have read the foregoing complaint and know the contents thereof. The same are true to my knowledge, except as to matters therein stated to be alleged on information and behalf and as to those matters I believe them to be true.

Case 1:23-cv-04468-KPF   Document 1-1   Filed 05/27/23   Page 22 of 22

_N. Weir_

Nicholas Weir

Sworn to before me this
28th day of June 2019

JONATHAN CORREA
Notary Public - State of New York
No. 01CO6316911
Qualified in Nassau County
My Commission Expires Dec. 22, 2018 2022